Argued and submitted July 8, 1991, affirmed on appeal and on cross-appeal April 22, decision withdrawn by order May 4, title of case amended as set forth and decision reissued in its entirety June 2, reconsideration denied November 18, petition for review pending 1992

Joe GRIFFIN,
by and through Doug Stanley,
Personal Representative of
the Estate of Joe Griffin, Deceased,
*Respondent - Cross-Appellant,*

*v.*

TRI-COUNTY METROPOLITAN
TRANSPORTATION DISTRICT
OF OREGON,
*Appellant - Cross-Respondent,*

*and*

James COWEN
and Donald Denson,
*Cross-Respondents.*

(A8902-01014; CA A64191)

831 P2d 42

Jeffrey M. Batchelor, Portland, argued the cause for appellant - cross-respondent and cross-respondents. With him on the briefs were Edwin A. Harnden, Richard N. Van Cleave, Thomas W. Sondag and Lane Powell Spears Lubersky, Portland.

Thomas A. Balmer, Portland, argued the cause for respondent - cross-appellant. On the brief were Lori Irish Bauman, Janice R. Wilson, Daniel H. Skerritt and Ater Wynne Hewitt Dodson & Skerritt, Portland.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

De MUNIZ, J.

## De MUNIZ, J.

Tri-County Metropolitan Transportation District (Tri-Met) appeals from a judgment awarding plaintiff damages on his claim of discrimination on account of a physical impairment in violation of ORS 659.425(1).[1] We affirm.

We recite the facts in plaintiff's favor. Or Const, Art VII (amended) § 3; *Jorritsma v. Farmers' Feed & Supply*, 272 Or 499, 502, 538 P2d 61 (1975).

Tri-Met hired plaintiff as a bus driver in 1976. He became a dispatcher in 1982 and remained in that position until 1989, when his employment ended. In 1985, he was diagnosed as HIV positive.[2] Early in 1987, he informed his supervisor, Denson, about the HIV diagnosis and asked Denson to keep the information confidential, which Denson agreed to do.

However, in September 1987, Chambers, Denson's supervisor, received an anonymous letter saying that plaintiff had AIDS. Chambers met with plaintiff and told him that, if he could not work regularly, he could not be employed by Tri-Met. Later, Denson demanded that plaintiff provide medical information releases for all of his physicians and that he provide information regarding his medications. Denson threatened to suspend plaintiff without pay until he complied with the demands.

---

[1] ORS 659.425(1) provides:

"For the purpose of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions, or privileges of employment because:

"(a) An individual has a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved;

"(b) An individual has a record of a physical or mental impairment; or

"(c) An individual is regarded as having a physical or mental impairment."

[2] HIV is the Human Immunodeficiency Virus and is the pathogen that causes AIDS. AIDS terminology has changed since the discovery of the disease. The term AIDS Related Complex (ARC) was used to describe the condition of a person who, in addition to testing positive for the virus, had certain symptoms, but not all of the symptoms called AIDS. "HIV disease" or "symptomatic HIV" disease are now used.

In October, 1987, plaintiff arranged a meeting with Dr. Loveless, his physician, Tri-Met's labor relations manager, Tri-Met's legal counsel, plaintiff's attorney, the president of plaintiff's union, Denson, Chambers and plaintiff. At the meeting, Loveless described HIV disease and plaintiff's prognosis. He explained that stress could exacerbate plaintiff's illness and that it was important that plaintiff maintain his daily routine of medical appointments, working out and attending support groups. His evening work schedule accommodated those activities.

Four days after the meeting with Loveless, Denson requested that plaintiff change shifts. Because shifts are assigned according to seniority and are not dictated by Tri-Met, plaintiff refused. Plaintiff views that as the beginning of the harassment that continued for the remainder of his Tri-Met employment. His work was more closely scrutinized than that of the other dispatchers. He was not allowed to use the restroom without supervisory permission, he was pestered about his use of the sick leave to which he was entitled and he was unnecessarily criticized.

In May, 1988, plaintiff sent a computer message to other dispatchers. The message read, "Did you hear the Chief [Denson] has herpes? He got it while kissing [someone's] * * * never mind."[3] When Denson read the message, he demanded that plaintiff be fired. Plaintiff was terminated, but an arbitrator reinstated him. He returned to work on November 14, 1988. After plaintiff's return, Chambers promulgated a policy that prohibited personal computer messages on Tri-Met's computer system. Plaintiff was aware of the new policy when, on November 22, 1988, he sent a message asking where his fellow dispatchers had been 25 years earlier, when President Kennedy was assassinated.

On November 30, 1988, Denson learned of the Kennedy message and discussed the matter with plaintiff. When plaintiff requested the presence of a union representative, Denson ordered him to appear the next day in Chambers' office. Plaintiff assumed that that meant that he would be fired. He worked the remainder of his shift and called his psychiatrist, Dr. Gregory, who advised him to stop working,

---

[3] The person named was also a Tri-Met employee.

because the stress was making him ill. Plaintiff never resumed working at Tri-Met and eventually filed this action.

Before trial, Tri-Met moved to strike eight of the allegations in plaintiff's second amended complaint on the ground that the facts occurred more than 180 days before plaintiff had given Tri-Met the claim notice required by the Oregon Tort Claims Act (OCTA). ORS 30.260 *et seq.* The court granted Tri-Met's motion.[4] Trial was set for December 28, 1989. Gregory was scheduled to be out of the state on that date. Plaintiff served notice on Tri-Met of his intent to perpetuate Gregory's testimony by deposition.[5] Tri-Met did not object,[6] and Gregory's deposition was taken. Trial was later reset to January 16, 1990. After the trial had been reset, Tri-Met subpoenaed Gregory and his records relating to his treatment of plaintiff. Plaintiff moved to quash the subpoena. The court quashed the subpoena but stated that either party could subsequently request that Gregory be compelled to testify.[7]

---

[4] ORCP 21E provides:

"Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these rules, upon motion made by a party within 10 days after the service of the pleadings upon such party or upon the court's own initiative at any time, the court may order stricken: (1) any sham, frivolous, or irrelevant pleading or defense or any pleading containing more than one claim or defense not separately stated; (2) any insufficient defense or any sham, frivolous, irrelevant, or redundant matter inserted in a pleading."

[5] ORCP 39I(1) provides:

"After commencement of any action, any party wishing to perpetuate the testimony of a witness for the purpose of trial or hearing may do so by serving a perpetuation deposition notice."

ORCP 39I(4) provides:

"Any perpetuation deposition shall be taken not less than seven days before the trial or hearing on not less that 14 days' notice, unless the court in which the action is pending allows a shorter period upon a showing of good cause."

[6] ORCP 39I(3) provides, in part:

"Prior to the time set for the deposition, any other party may object to the perpetuation deposition. Such objection shall be governed by the standards set forth in Rule 36 C. At any hearing on such objection, the burden shall be on the party seeking perpetuation to show that: (a) the witness may be unavailable as defined in ORS 40.465(1)(d) or (e) [OEC 805 (1)(d) or (e)] or 45.250(2)(a) through (c); or (b) it would be an undue hardship on the witness to appear at the trial or hearing; or (c) other good cause exists for allowing the perpetuation."

[7] ORCP 55B provides, in part:

"In any case, where a subpoena commands the production of books, papers, documents or tangible things the court, upon motion made promptly and in any

Tri-Met assigns error to the denial of its motion to exclude evidence of conduct that occurred more than 180 days before plaintiff gave notice under the Oregon Tort Claims Act OTCA. In addition, Tri-Met asserts that, even if admission of that evidence was proper as tending to prove discriminatory intent, the court nevertheless erred by not giving an instruction limiting the jury's consideration of it. Plaintiff, in a related cross-assignment of error, argues that the court erred in striking his allegations of Tri-Met's conduct that occurred before January, 1988, and, consequently, the evidence supporting those allegations was admissible without limitation. We consider the cross-assignment first.

We accept as true all well-pleaded allegations and any facts that might conceivably prove those allegations. *Doyle v. Oregon Bank*, 94 Or App 230, 232, 764 P2d 1379 (1988), *rev den* 307 Or 571 (1989). Plaintiff was required to give Tri-Met notice of his claim.[8] Five of the allegations stricken from plaintiff's second amended complaint were based on occurrences in May, 1988. Tri-Met stipulated that proper notice was given on July 6, 1988. Therefore, those allegations and the evidence supporting them were properly before the jury.[9] We therefore need only consider the allegations and evidence of the three events that occurred before January 6, 1988.

---

event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things."

[8] ORS 30.275 provides, in part:

"(1) No action arising from any act or omission of a public body or an officer, employee, or agent of a public body within the scope of ORS 30.260 to 30.300 shall be maintained unless notice of claim is given as required by this section.

"(2) Notice of claim shall be given within the following applicable period of time, not including the period, not exceeding 90 days, during which the person injured is unable to give notice because of the injury or because of minority, incompetency, or other incapacity:

"(a) For wrongful death, within one year of the alleged loss or injury.

"(b) For all other claims, within 180 days after the alleged loss or injury."

[9] At the conclusion of the evidence, when plaintiff sought to conform the pleadings to the evidence, Tri-Met stipulated that it had received the required notice of claim on July 6, 1988, and that events occurring after January 6, 1988, were covered thereby.

■     Plaintiff argues that the allegations should not have been stricken from his second amended complaint, because they were part of a continuing tort.[10] The allegations are:

"During and after October 1987, Tri-Met, through its General Manager, James Cowen, and its supervisors, including Defendant Denson, took actions to deliberately place extraneous stress on plaintiff in his work environment, including:

"* * * * *

"c.   On November 12, 1987, reprimanding plaintiff and threatening to discharge him for using the sick leave to which he was entitled;

"d.   On October 15, 1987, demanding that plaintiff provide letters of consent to his doctors so that Tri-Met could privately investigate plaintiff' health;

"e.   On October 10, 1987, threatening plaintiff with suspension if he did not provide a list of medications prescribed for his illness * * *.""

Oregon cases have used a continuing tort analysis to allow claims that would otherwise be time-barred. *See Shives v. Chamberlain*, 168 Or 676, 126 P2d 28 (1942). The cases arose in a variety of fact patterns and do not readily produce a single rule. *See Adams v. Oregon State Police*, 289 Or 233, 611 P2d 1153 (1980); *Holdner v. Columbia County*, 51 Or App 605, 627 P2d 4 (1981). However, in *Davis v. Bostick*, 282 Or 667, 580 P2d 544 (1978), the court stated concisely the concept of continuing tort:

"[A]t the heart of the continuing tort idea is the concept that recovery is for the cumulative effect of wrongful behavior, not for discrete elements of that conduct." 282 Or at 671.

In *Davis*, the defendant's physical and mental abuse of the plaintiff were continuous in the sense that, all together, the abuse was a course of conduct. However, the court held that, because the defendant's acts were discreet and egregious in nature, each abusive act was separately actionable and not

---

[10] Tri-Met argues that plaintiff did not make out a continuing tort, because the allegations amount to a series of discrete acts. The argument is confusing because of Tri-Met's assertion that the court was not authorized to award plaintiff attorney fees and costs. Implicit in the attorney fees argument is the contention that plaintiff's claim results from a single accident or occurrence. That is inconsistent with Tri-Met's earlier position regarding the continuing tort.

merely an element of a single tort. Here, the October and November, 1987 acts, although separate incidents, are not the type of discrete, permanent events that would likely support separate actions for wrongful discrimination. Instead, they can be reasonably construed as elements of a systematic pattern of conduct, aimed at causing plaintiff's eventual termination. The allegations should not have been stricken. Accordingly, plaintiff was entitled to have the evidence supporting the allegations admitted without limitation, not solely for the purpose of proving discriminatory intent. Because plaintiff's cross-assignment is well taken, Tri-Met's claims that the court erred in admitting the evidence and by failing to give an instruction limiting the jury's consideration of the evidence are without merit.

■ Tri-Met also assigns error to the quashing of its subpoena compelling the appearance of Gregory. The court's ruling on Tri-Met's initial motion expressly provided that either party could later request that Gregory be compelled to testify. Tri-Met contends that this colloquy renewed its motion to compel his appearance:

> The Court: "That creates a problem in my mind. In the treating doctor's file, you have reports from other physicians. Now, if we turn the clock back, and Gregory was on the stand, it's probable that you could have cross-examined him about, one, whether he had used those reports in treating or had read them in preparation for his testimony, but no matter what his answer would have been, I can't see how they would have come in physically as evidence.
>
> "Help me on that point.
>
> Tri-Met's counsel: "Okay. Well, then I guess it really has to be my — my second point is we would request permission to, *if necessary*, to bring Dr. Gregory in and ask him about that. *We can do it either way.*" (Emphasis supplied.)

Tri-Met's request was for the admission of Gregory's files *or* to have Gregory testify. The files were admitted, and Tri-Met's counsel relied on them in closing argument. Tri-Met received what it requested and cannot now complain that what it sought was not sufficient. Accordingly, the error, if any, was invited.

■ Tri-Met also assigns error to the court's award of costs and attorney fees to plaintiff in excess of the liability cap

fixed by OTCA. This assignment turns on the interplay between ORS 30.270(4) and ORS 659.121(1). ORS 30.270(4) provides:

> "Liability of any public body and one or more of its officers, employees, or agents or two or more officers, employees, or agents of a public body, on claims arising out of a single accident or occurrence, shall not exceed in the aggregate the amounts limited by subsection (1) of this section."

ORS 30.270(1) provides, in part:

> "Liability of any public body or its officers, employees or agents acting within the scope of their employment or duties on claims within the scope of ORS 30.260 shall not exceed:
>
> "* * * * *
>
> "(b) $100,000 to any claimant as general and special damages for all other [non-property] claims arising out of a single occurrence unless those damages exceed $100,000, in which case the claimant may recover additional special damages, but in no event shall the total award of special damages exceed $100,000."

ORS 659.121(1) provides, in part:

> "Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS 399.235, 659.030, 659.035, 659.227, 659.270, 659.295, 659.330, 659.340, 659.410, 659.415, 659.420 or 659.425 may file a civil suit * * *. In any suit brought under this subsection, the court may allow the prevailing party costs and reasonable attorney fees at trial and on appeal."

Tri-Met argues that, because the maximum allowable compensatory damages were awarded, the court was not authorized to award any attorney fees and costs.

Tri-Met's argument assumes that the claim for attorney fees and costs is covered by ORS 30.270(4). OTCA is concerned only with the tortious conduct of public bodies and their officers, employees or agents. It specifically covers only tort claims, which are defined by it as "the breach of a legal duty * * * which results in injury * * * [and] for which the law provides a civil right of action for damages or for a protective remedy." ORS 30.260(8). It does not include attorney fees and costs within the definition of a tort claim. Awards for attorney fees and costs only indirectly arise from "the breach

of a legal duty" and are only indirectly related to an "injury" and are not designed to be a "protective remedy" or to "provide a civil right of action for damages."

One obvious purpose of ORS 659.121 is to ameliorate the financial burdens associated with litigation to vindicate a person's right not to be discriminated against unlawfully. The tort claim in this case is the discriminatory conduct of the tortfeasor. Given the narrow reach of OTCA, we hold that awards of attorney fees and costs were not intended to be included within the liability limit in OTCA.

■ Tri-Met also assigns error to the court's determination of the amount of plaintiff's attorney fees and costs award. ORS 659.121(2) provides that the court may award reasonable attorney fees to the prevailing party. Neither ORS 659.121(2) nor ORCP 68C specify how the court determines what is reasonable. The trial court has substantial discretion in fixing the fees. *Creditors Protective Assoc. v. Britt*, 58 Or App 230, 235, 648 P2d 414 (1982). A determination of attorney fees will be set aside only if it is not supported by substantial evidence. *Northwest Acceptance Corp. v. Bles Studs, Inc.*, 105 Or App 54, 60, 803 P2d 775 (1990), *rev den* 311 Or 432 (1991).

■ In reviewing awards, we consider the time devoted to the case, the difficulty and complexity of the issues involved, the nature of the proceedings, the value of the interests involved, the result secured and the skill and standing of counsel for the parties involved. *Hess v. Seeger*, 55 Or App 746, 766, 641 P2d 23, *rev den* 293 Or 103 (1982). Plaintiff introduced evidence on each of those. Tri-Met offered no evidence in opposition. The evidence amply supports the court's finding that this was a complex, controversial and high risk case. Plaintiff's principal attorney was "established in the field" and in taking this case had deprived herself and her firm of her services for other clients, actual or potential, for a significant period of time.

Tri-Met contends that the court erred in awarding fees at the rate of $270 per hour, which was twice counsel's standard rate. Tri-Met relies exclusively on federal cases where the use of a "multiplier" in setting attorney fees was at issue. Most of that reported litigation is unhelpful and the

formulas used are unduly cumbersome. Instead, we continue to review the reasonableness of attorney fee awards by using the factors outlined in *Hess*.

Plaintiff introduced extensive evidence regarding the reasonableness of counsel's request for $270 per hour. Expert testimony, unchallenged by Tri-Met, established that there are only a limited number of attorneys willing and able to take on complex, controversial and high risk employment cases. The evidence showed that plaintiffs generally experience difficulty in obtaining qualified counsel and also that counsel who successfully undertake the cases for a contingency fee are generally compensated at rates greatly exceeding standard billing rates for general legal services. We conclude that there was substantial evidence supporting the attorney fees award and hold that, under the circumstances of this case, the court did not abuse its discretion in awarding fees at twice counsel's standard rate.

Plaintiff cross-appeals and assigns error to the court's limitation of his damages to $100,000. However, plaintiff failed to raise this issue in any way in the court below. We decline to consider his arguments raised for the first time on appeal. ORAP 5.45(2); *Cooper v. Eugene School Dist. No. 4J*, 301 Or 358, 723 P2d 298 (1986), *appeal dismissed* 480 US 942 (1987).

All of the other assignments of error are without merit.

Affirmed on appeal and on cross-appeal.